# EXHIBIT 2

**IN THE CIRCUIT COURT**
**FOR BALTIMORE CITY**

Michele Williams )
)
Plaintiff, )
v. )
)
)
Case No.: )
)
Morgan State University )
)
and )
)
DeWayne Wickham (in his personal capacity) )
)
Defendant, )
)
)
)

## COMPLAINT

Plaintiff, Michele Williams, brings this action on to recover civil damages under Maryland common law torts against the Defendant, Morgan State University.

## THE PARTIES

1. Plaintiff Michele Williams (hereinafter referred to as "Plaintiff" or "Ms. Williams") is a resident of the District of Columbia.

2. Plaintiff currently resides at 77 Randolph Place NW Washington, DC 20001

3. At all times relevant to this complaint, Plaintiff was employed in the State of Maryland.

4. Plaintiff is over the age of eighteen (18).

5. Defendant Morgan State University is a State of Maryland public university

1

CIVIL LITIGATION DIVISION
RECEIVED
JUN 1 5 2018
Office of the Attorney General

6. Defendant is an Agency of the State of Maryland.

7. Defendant DeWayne Wickham is an individual being sued in his individual capacity.

8. At all times relevant to this complaint, Plaintiff was employed by Morgan State University.

## JURISDICTION

9. The United States District Court for the District of Maryland has jurisdiction over this matter.

10. At all times relevant to this complaint, Plaintiff was employed by Defendant in the State of Maryland.

11. The actions and decisions described in this Complaint substantially occurred in Maryland.

12. Plaintiff brings her claims pursuant to federal law and Maryland common law.

13. Plaintiff's claims raise questions of federal law.

14. This Court has supplemental jurisdiction over Plaintiff's claims under Maryland common law pursuant to 28 U.S.C. §1367 as such claims are part of the same case and controversy as Plaintiff's federal claims and derive from a common nucleus of operative facts.

15. This Court has jurisdiction over Plaintiff's state law claims under 31 U.S.C. §3732 (b).

16. The United States District Court for the District of Maryland has personal jurisdiction over the parties as described in ¶¶ 1-20, *supra.*

## ALLEGATIONS

17. Plaintiff was formerly employed by Defendant as a broadcast manager.

18. Plaintiff has more than twenty (30) years' experience in the broadcast industry and has received numerous awards and accolades.

2

19. For example, Plaintiff was recognized as one of "the top 15 Women" in broadcasting and one of the "top 15 General Managers" in radio broadcasting.

20. Plaintiff has substantial experience in managing multimillion dollar radio budgets in major radio markets.

21. Plaintiff was hired by Defendant, Morgan State University on January 2, 2014.

22. Plaintiff's position title was "Director of Broadcast Operations."

23. Among other things, Plaintiff was responsible for oversight and management of the University's broadcast operations, including the radio station (WEAA 88.9 FM), television broadcast and student run radio station (WMUR).

24. Morgan State University operates through state and federal funding.

25. Morgan State University receives substantial financial assistance from federal programs.

26. One program under which Morgan State University receives significant federal funding is a program administered by the Corporation for Public Broadcasting.

27. The Corporation for Public Broadcasting is an entity established by Congress for the administration of federally appropriated funds to various public broadcasting entities.

28. The Corporation for Public Broadcasting administers federal funds through a grant program.

29. The CPB grant program has numerous reporting requirements that participants are required to comply with to receive federal funds.

30. As a public broadcaster, Morgan State University is eligible for receipt of federal funds pursuant to the program administered by the CPB.

31. In March 2016, WEAA organized and hosted a public debate in the Baltimore Mayoral democratic primary. The debate was held on Morgan State's campus.

3

32. The event was a success, leading to positive publicity and local news network coverage for Morgan State University.

33. In November 2016, there were four candidates remaining in the Baltimore Mayor general race.

34. These candidates were:  Catherine Pugh (Democrat); Sheila Dixon (Write-in) Alan Walden (Republican) and Joshua Harris (Green party).

35.  Based on the success of the primary debate, Plaintiff began organizing a general election debate in WEAA's radio studio to be held on November 3, 2016.

36. After scheduling the debate, Plaintiff's supervisor, Dean Wickham, contacted Plaintiff concerning the debate.  Dean Wickham also copied University President, David Wilson.

37. Plaintiff notified Dean Wickham that each candidate that had been invited to participate in the debate would be provided equal time so as to avoid Morgan State favoring or creating the appearance of favoring a particular candidate.  University President Wilson separately emailed Plaintiff and told her that the University "must not give the appearance of favoring one candidate over another and that the station could lose its license if it engaged in such behavior" or words to that effect.

38. At some point after the debate was schedule, Catherine Pugh (the Democratic candidate) contacted Dean Wickham to notify him that that she was not able to attend the debate and "would be interested in participating in an on-air interview at another time prior to the election."

39. After Dean Wickham was contacted by Ms. Pugh, Dean Wickham forwarded the email from Ms. Pugh to the Plaintiff and told  Plaintiff that she must cancel the debate if all four candidates could not participate.

4

40. The reasonable inference is that Dean Wickham instructed Ms. Williams to cancel the debate because Dean Wickham had received that request from Ms. Pugh, the Democratic candidate - and Dean Wickham favored the Democratic candidate.

41. Dean Wickham's instructions to cancel the debate were contradictory to the previously described requirement that a non-attending candidate be provided an interview on-air in lieu of attendance at the debate.

42. The reasonable inference is that Ms. Pugh's campaign requested Dean Wickham to cancel the debate - rather than to provide Ms. Pugh separate air time.

43. By cancelling the debate, Ms. Pugh's campaign hoped to silence the other candidates in the midst of a tight Mayoral race.

44. Dean Wickham was attempting to influence the course of public debate in the Baltimore Mayoral candidate race by requiring Plaintiff treat the Democratic candidate differently than other parties' candidates.

45. Dean Wickham would not have required the debate to be canceled if any other candidate were not available on the day of the debate.

46. After Plaintiff was directed to cancel the debate, local news media came out with articles questioning whether the University had inappropriately endorsed Mayor Pugh by canceling the debate when Mayor Pugh could not attend.

47. The following day, Plaintiff scheduled equal air time for the Republican and Green party candidates at their request - because the University had provided air time (a few weeks prior) for the Independent candidate.

48. Plaintiff, as the Broadcast Manager, believed her actions were fair and equitable to the candidates and complied with best broadcast practices, Maryland and federal law.

49. At no point was Mayor Pugh denied a request for equal air time. In fact, Mayor Pugh was offered equal time by the radio station.

50. After Plaintiff scheduled aired equal time for the other candidates' interviews - Dean Wickham sent Plaintiff threatening text messages and emails.

51. The inference from Dean Wickham's communications to Plaintiff that Dean Wickham harbored a politically motivated desire not to allow other candidates on the air in the absence of Mayor Pugh - and Plaintiff's actions would, in Dean Wickham's words, "not end well" for her.

52. Plaintiff subsequently complained to University President, David Wilson, University Provost Gloria Gibson and University Vice President of Human Resources and others that Dean Wickham's actions had violated the Hatch Act, 5 U.S.C. §1502(a)(1)-(3) and Maryland and federal law concerning political activity by a State institution in receipt of federal funding.

53. As part of Plaintiff's role as Broadcast Manager, Plaintiff was also responsible for investigating and certifying audited financial statements that were submitted by Morgan State University to the CPB.

54. The financial statements submitted by Morgan State to CPB affect Morgan State University's funding by the CPB - and the State of Maryland.

55. If Morgan State University shows a certain levels of operating expenditures to CPB - then Morgan State becomes eligible for a certain level of federal funds through CPB's grant program.

56. In addition, Morgan State sends financial statements to the State of Maryland as a State Public University.

6

57. The financial statements directly impact the budget for Morgan State University and its funding.

58. In or around late 2016, Plaintiff began noticing serious discrepancies with respect to WEAA's actual operating expenses and WEAA's expenses as being reported by the University.

59. For example, Plaintiff was aware that she actively managed operating expenses in the range of $750,000.00.

60. However, in 2014, 2015 and 2016 - the University reported that WEAA had operating expenses of approximately $1,750,000.00 -$1,900,000.00.

61. Essentially, the University was reporting to the State of Maryland and CPB that WEAA had operating expenses of around $1,000,000 more than its actual expenses.

62. The net effect of this reporting was to a) increase Morgan State's funding from the State of Maryland and b) increase Morgan State's CPB funding eligibility and access to federal grant funds.

63. In 2016, Ms. Williams was asked to endorse the operating expense figures reported by the University.

64. In 2016 - Ms. Williams complained to Dean Wickham that she believed that the operating expenses were being intentionally inflated to pad the University's funding.

65. Plaintiff made repeated complaints to the University's upper management and financial executives about the misreporting of funds.

66. Plaintiff also complained to Dean Wickham that the numbers reported in expenditure categories for the station by Plaintiff to the University's financial team were not the same figures being reported by the University to the Corporation for Public

7

Broadcasting and the State of Maryland.   Plaintiff also complained to the VP of the finance department, Sidney Evans, the Asst VP of Finance, University Comptroller, Pat O'Brien, the University's external and internal auditors, the Chief IT officer and the Budget Officer.

67. When Plaintiff requested to hold meetings with Dean Wickham to discuss the misreporting of WEAA's operating costs, Dean Wickham failed to show for the meetings.

68. Plaintiff refused to sign off / attest to financial statements with $1,000,000 in variance from the actual expenditures.

69. In 2017, the University was preparing its 2016 fiscal reporting.

70. Just as in previous years, the University intended on overstating the operating costs of WEAA to the tune of approximately $1,000,000.

71. Just as Plaintiff had complained in 2016 about the misreporting of operating costs, in 2017 Plaintiff continued her complaints about the misreporting of operating costs.

72. Plaintiff let Dean Wickham and others within the University's financial department know that she was blowing the whistle on the University's practice of overstating the operating costs of WEAA.

73. Defendant was also aware that Plaintiff had previously been contacted by the CPB about WEAA's budget and that, as Principal Investigator for the CPB Grant, Plaintiff could and would notify CPB of any misreporting of the University's operating costs.

74. Rather than have Plaintiff raise issues about to CPB or the State of Maryland, Defendant made the decision to terminate Plaintiff.

8

75. On May 2, 2017 Defendant notified Plaintiff that she would be terminated effective August 8, 2017.  The timing of Plaintiff's termination was such that Plaintiff was precluded from having any participation in the fiscal year financial statements.

76. Plaintiff's termination coincided with the University's 2016 fiscal year financial statement deadlines so as to exclude Plaintiff from the process of creating and submitting financial statements to the State of Maryland and to CPB.

77. On August 8, 2017, Plaintiff was terminated from her position.

78. Defendant's actions were willful and malicious.

### Compliance with the Maryland Tort Claims Act.

79. Prior to filing the instant action, Plaintiff gave notice to the Maryland Treasurer pursuant to the Maryland Tort Claims Act.

80. Plaintiff has fully complied with the Maryland Tort Claims Act.

81. Plaintiff sent a letter, certified mail, to the State Treasurer containing the information required by Maryland Code, State Govt., § 12-107.

### COUNT I

### Wrongful Termination in Violation of Maryland Public Policy

82. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

83. Defendants terminated Plaintiff in contravention of a clear mandate of public policy.

84. The State of Maryland has expressed the following public policies applicable to Plaintiff's employment:

Md. EDUCATION Code Ann. § 10-202,

> (5) The people of Maryland are entitled to efficient and effective management of public higher education; and

9

Md. EDUCATION Code Ann. §14-104,

(f) Budget. -- The Board of Regents may prepare and submit annual budgets and spend funds budgeted for nonsalary items on appropriate activities.

(h)(3)(iii) By September 1 of each year, the Board of Regents shall submit an annual position accountability report to the Department of Budget and Management, the Department of Legislative Services, and the Maryland Higher Education Commission reporting the total positions created and the cost and the funding source for any positions created by the University in the previous fiscal year.

(l) Gifts and grants. --

(1) The Board of Regents may apply for, accept, and spend any gift or grant from the federal government, any foundation, or any other person.

(2) Any gift or grant the Board of Regents accepts shall be deposited with the State Treasurer in a nonbudgeted account and may be invested as the Board of Regents directs in accordance with law.

Md. General Provisions Code Ann. § 5-506

(a) In general. --

(1) An official or employee may not intentionally use the prestige of office or public position:

(i) for that official's or employee's private gain or that of another; or

(ii) to influence, except as part of the official duties of the official or employee or as a usual and customary constituent service without additional compensation, the award of a State or local contract to a specific person.

(2) An official may not directly or indirectly initiate a solicitation for a person to retain the compensated services of a particular regulated lobbyist or lobbying firm.

Md. STATE PERSONNEL AND PENSIONS Code Ann. §2-304 Political Activities

(c) Restrictions on political activities. -- An employee may not:

(1) engage in political activity while on the job during working hours; or

10

(2) advocate the overthrow of the government by unconstitutional or violent means.

Md. EDUCATION CODE, § 24-206. Fairness and legality of operation

(a) Fairness. -- The facilities of the Commission may not be used for, and the programs may not be devoted to:

(1) Presenting biased or one-sided aspects of partisan politics;

(2) Advocating or opposing any present or prospective political candidacy; or

(3) Advocating or opposing any legislation currently being considered or prepared.

(b) Legality. -- Each facility shall be used in compliance with the rules and regulations of the Federal Communications Commission.

85. There is a nexus between Plaintiff's conduct and Plaintiff's termination.

86. Plaintiff attempted to exercise a statutory duty, right or privilege.

87. Defendant acted willfully and maliciously

88. Plaintiff suffered pecuniary and non-pecuniary actions as the result of her wrongful termination.

89. At all times relevant to this case, Defendants were acting in furtherance of Defendants' business.

90. Plaintiff seeks judgment in the amount of $1,000,000 on Count I.

## COUNT II

### Defamation (against Defendant DeWayne Wickham)

91. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

92. Defendant, DeWayne Wickhm, made defamatory statements to third persons.

11

93. DeWayne Wickham falsely and publicly accused Plaintiff to Plaintiff's colleagues of securing a grant from the Robert Deutsch Foundation for the express purpose of giving the funds to Marc Steiner and the Center for Emerging Media and thereby using the radio station as a pass-through.

94. The funds were solicited and secured by an independent local radio producer for the express purpose of the production of her radio show "The Rise of Charm City" which is common in public radio.

95. DeWayne Wickham falsely and publicly accused Plaintiff of making expenditures within the radio station that were not actually made - which led Plaintiff to ultimately be terminated.

96. Plaintiff objected to or refused to participate in any activity, policy, or practice that the Plaintiff reasonably believed was a violation of Md. General Provisions Code Ann.§ 8-102 or a regulation adopted under that title.

97. DeWayne Wickham's statements about Plaintiff were false.

98. DeWayne Wickham was legally at fault in making the statements.

99. The Plaintiff suffered harm by DeWayne Wickham's statements.

100.    DeWayne Wickham had actual knowledge that his statements about Plaintiff were false.

101.    DeWayne Wickham intended that his false statements would lead Plaintiff to be terminated from her position.

102.    Plaintiff seeks judgment in the amount of $1,000,000 on Count II.

**WHEREFORE,** Plaintiff demands judgment against Defendants for the following relief:

a. An injunction to restrain a continuing violation of subsection (a) of this section;

12

b. Reinstatement to the same seniority status held before the retaliatory action;

c. Reinstatement of full fringe benefits and seniority rights;

d. An amount of lost wages, benefits, and other remuneration, including any interest accumulated;

e. Payment by the person of reasonable costs and attorney's fees;

f. Punitive damages;

g. An assessment of a civil penalty:

h. Any other relief necessary to make the employee, including compensatory damages.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts

Respectfully submitted,

_Daniel E. Kenney, Esq_
Daniel E. Kenney, Esq.
DK Associates, LLC
5425 Wisconsin Avenue, Suite 600
PMB #653
Chevy Chase, MD 20815
202-430-5966 Phone
dan@dkemployment.com

_Morris E. Fischer, Esq._
Morris E. Fischer, Esq.
Morris E. Fischer, LLC
~~1400 Spring Street, Suite 350~~ 8720 Georgia Ave. Ste 2k
Silver Spring, MD 20910
301-328-7631 Phone
morris@mfischerlaw.com

Attorneys for Plaintiff

13

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Brian E. Frosh

Maryland Attorney General

200 St. Paul Place

Baltimore, MD 21202

9590 9402 2885 7069 7694 78

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent
                   ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

Meghan K. Casey    6/15/18

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery

USPS TRACKING #



9590 9402 2885 7069 7694 78

**United States Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

\* Sender: Please print your name, address, and ZIP+4® in this box\*

Morris E. Fischer, LLC
8720 Georgia Ave Ste 210
Silver Spring, MD 20910-3614